UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION


VIVIAN GARRIGA,

    Plaintiff,

v.                                                Case No. 8:08-CV-00708-T-17MAP

NOVO NORDISK, INC.,
a foreign corporation,

    Defendant.
_____/

**ORDER**

This cause is before the Court on Defendant's Motion for Summary Judgment filed on May 5, 2009 (Doc. 16), and the Plaintiff's response thereto. For the reasons set below, Defendant's Motion for Summary Judgment is **GRANTED**.

**I.**
**Background[1]**

On April 14, 2008, the plaintiff, Vivian Garriga, filed a complaint against the defendant, Novo Nordisk, Inc., in the United States District Court for the Middle District of Florida, Tampa Division. (Doc. 1). Plaintiff seeks relief pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and the Florida Civil Rights Act of 1992, Florida Statutes, Chapter 760, alleging sexual harassment and retaliation. Defendant answered with affirmative defenses on June 16, 2008. (Doc. 4). Defendant denies any wrongdoing and maintains that relief is inappropriate. Plaintiff filed a response to Defendant's Motion for Summary Judgment on May 26, 2009. The parties dispute whether Defendant's conduct is enough, as a matter of law, to constitute sexual

---
[1] The facts arise from the Plaintiff's deposition, Exhibit Garriga Depo. to Doc. 25, unless otherwise indicated.

harassment and retaliation. We view the following facts in the light most favorable to the Plaintiff. These facts are taken as true for the limited purpose of resolving this motion.

Novo Nordisk, Inc. is a subsidiary of Novo Nordisk A/S, a Danish manufacturer and distributor of insulin and diabetes care products. Novo Nordisk Inc. is responsible for the sale and marketing of Novo Nordisk A/S's pharmaceutical products in the United States.

Novo Nordisk requires employees to follow the rules set forth in their company Code of Conduct. The Code of Conduct specifically states that Novo Nordisk's policy is to follow the Pharmaceutical Research and Manufacturers of America (PhRMA) Code when evaluating the appropriateness of gifts, meals and entertainment for physicians, pharmacists and other Health Care Professionals. Because of the federal Anti-Kickback Law, PhRMA created the PhRMA Code to provide guidelines for adhering to the law. This Code includes provisions concerning providing meals to healthcare providers. The PhRMA Code and the Novo Nordisk Code of Conduct was in effect during all times relevant to this lawsuit.

Vivian Garriga began working for Novo Nordisk on April 30, 2001, as a Senior Diabetes Care Specialist. Her manager, Brian Taylor, was hired in late March 2007 as the District Business Manager of the Tampa district, which included Garriga's territory.

The two first met in a group meeting on May 8, 2007, when Taylor for the first time met with all of his direct reports in the district. At one point in the meeting, Taylor asked everyone present – both men and women – which celebrity they would most like to sleep with.

As a part of his duty as a District Business Manager, Taylor observed the Diabetes Care Specialists he supervised via ride-alongs. In the course of Taylor's first ride-along with Garriga on May 17, 2007, Garriga and Taylor were in a parking lot when Taylor grabbed Garriga around the shoulder. He claims he did this to warn her about a car coming; however there was no such car

according to Plaintiff. The next day, May 18, 2007, Taylor conducted another ride-along with Garriga. During both of these ride-alongs, Taylor would walk behind Garriga and allegedly stare at her backside. After the ride-alongs, Taylor made notes that Garriga needed improvement in four areas, and noted that "it is important that I see marked improvement in the areas that I identified and with the overall sales performance for your territory." (Ex. 24 to Doc. 25).

Taylor met with Garriga and her partner, Jamie Duffy, two weeks later, on June 1, 2007. In that meeting, Taylor said to the two that "the last thing you guys want is my 13-inch foot down your back."

The next ride along was over a month later, on July 10, 2007. Taylor was again walking behind Garriga, which prompted Garriga to complain to Taylor about walking behind her and staring at her. During the ride-along, Taylor told Garriga she was not meeting his expectations as a senior pharmaceutical representative, he would recommend that she find another job, that she had not sold anything, that she couldn't sell, and that she "sucked."

Garriga sent Jamie Duffy an e-mail on July 11, 2007, that made reference to a party that would be held at the house of one of her clients, Dr. Shah, on July 20, 2007. Taylor was copied on the e-mail; he made no response at the time.

At a district meeting on July 16, 2007, Garriga claims that Taylor kept her as well as two other Diabetes Care Specialists locked out of the meeting for "15 minutes, an hour, maybe" until there was a break in the meeting because they were late.

The next day, July 17, 2007, Taylor made Garriga wait to meet with him to discuss her individual development plan. He asked Garriga if she wanted to relocate and told her that she "sucked."

On July 18, 2007, Garriga complained to Human Resources Generalist Roger Arnell that Taylor had sexually harassed her. (Complaint at ¶ 11). Novo Nordisk has an anti-harassment policy. She told Arnell that Taylor glared at her breasts an indeterminate amount of times, all of which occurring during five particular days over the span of two months. Specifically, Taylor had leered at her on May 17th, June 1st, and July 10th but she couldn't recall how many times, once on July 16th during the district meeting, and again on July 17th when she was sitting across from him. On those same days, Taylor had also looked at her disapprovingly.

After conducting an investigation, Arnell recommended that Taylor take sensitivity training, retake Novo Nordisk's sexual harassment training, and take part in the New Leader Integration program. (Arnell Dec. ¶ 5).

The night of July 20, 2007, a dinner party was held at Dr. Shah's home. Garriga purchased and brought the dinner, and Jamie Duffy had purchased dessert and refreshments. Garriga and Duffy's boyfriends were in attendance. During the evening, Garriga and Duffy conducted a medical educational session lasting about forty-five minutes for the people in attendance, all of whom worked for Dr. Shah's staff in some capacity (with exception to the boyfriends). The event originally referenced as a surprise party in the July 11, 2007, e-mail had, at some point between July 11 and the event on July 20, evolved into an education session. Garriga says, without specificity as to time, place or manner, that she made Taylor aware of these changes.

Taylor learned on or around July 22, 2007, that Garriga had made a sexual harassment charge against him. The following week, Garriga went on vacation. On August 1, 2007, shortly after Garriga's return, Taylor read and gave Garriga a Coaching Worksheet. Garriga's Coaching Worksheet noted five areas of concern, and also noted that Garriga's sales performance for two particular drugs needed improvement. (Ex. 25 to Doc. 25). When Taylor gave Garriga the Coaching

Worksheet, he told her that she couldn't sell, she hadn't sold anything, and that she "sucked." Again, Taylor looked at her disapprovingly.

Novo Nordisk uses several different systems to monitor sales numbers. Taylor elected to use a system that uses older but more accurate data, known as the Incentive Compensation ("IC") system. Garriga complained to Taylor that her May 2007 sales numbers were better than what the IC system showed, though the April numbers were the newest available. The May numbers Garriga referenced were eventually released for the IC system later that same day.

Within a week of placing Garriga on a Coaching Worksheet, Taylor placed another employee on a Coaching Worksheet. For that worksheet, he also used the IC sales number system, and indicated several areas of concern. The other employee placed on a Coaching Worksheet had not made any complaints to Novo Nordisk regarding Taylor.

The final ride-along with Garriga and Taylor was the next day, August 2, 2007. While in a doctor's office, a receptionist handed Garriga a picture of Garriga and her boyfriend, taken during the dinner party at Dr. Shah's house. Taylor questioned Garriga about the dinner, and became livid. Taylor said that she "sucked," that her name was going to be all over the Wall Street Journal, that he was going to report her, that she was not going to work in the pharmaceutical industry again, and that he was going to put his "13 inch foot up her ass." He also called Garriga a candy store and candy shop while the two were in Dr. Shah's office.

Taylor had first called Garriga a candy shop and candy store after receiving an invoice where it appeared, to him, that Garriga had spent over fifty dollars on candy. Taylor continued to call her by this name on multiple occasions from that point on, including during this encounter at Dr. Shah's office, despite the requests by Garriga for him to stop. At other times, Taylor had also called

Garriga's partner, Jamie Duffy, by the nickname "Duffylicious." Duffy had told Taylor he could call her by that nickname. (Taylor Dec. ¶ 5).

On or about August 3rd, Taylor e-mailed Roger Arnell and Regional Business Director Sheila Sewock about a potential violation of PhRMA Code and Novo Nordisk company policy. (Ex. 4 to Doc. 17). The e-mail was entitled "Vivian's Compliance Violation" and did not reference Duffy; however, shortly afterward Taylor recommended the termination of both Garriga and Duffy. (*Id.*).

Roger Arnell in turn alerted Novo Nordisk's Legal Department, Sharon Slayback, Senior Director of Human Resources, and Malte Pendergast-Fischer, another Human Resources Generalist. (Ex. 3 to Doc. 17). After conducting their own investigation, Arnell and Pendergast-Fischer met with Legal and Compliance to present the information they had obtained from interviewing Garriga and Duffy. (*Id.*)

The investigators found that based on Garriga's own e-mail and Duffy's interview, the primary purpose of the event was a farewell party for Dr. Mabalot and not an informational presentation, and that Garriga and Duffy had, therefore, violated company policy by providing food and beverages. (Ex. 3, 5 to Doc. 17). The investigators further found that even if the primary purpose of the event had been to provide an informational presentation, Garriga and Duffy would have still violated company policy by holding the presentation at an inappropriate venue for an informational presentation (e.g. a private waterfront home and in connection with a farewell party) and by having their boyfriends present. (*Id.*). Based on the circumstances and the type of compliance violation, the Human Resources and Compliance Departments recommended that both Garriga and Duffy be terminated. (Ex. 3 to Doc. 17). Duffy never made any sexual harassment or other complaints to Novo Nordisk regarding Taylor. (*Id.*).

The results of the investigation and recommendation of Human Resources and Compliance were presented to Sheila Sewock who, as the Regional Business Director of the Florida Region, was responsible for making the decisions whether to terminate both Garriga and Duffy. (Ex. 2 to Doc. 17). Sewock agreed with the recommendations and that there had been a violation of Company policy, which includes the PhRMA Code guidelines. (*Id.*). She made the decision to terminate both Garriga and Duffy for violation of the same company policy on September 6, 2007. (*Id.*). Taylor did not make any recommendation to Sewock about whether Garriga or Duffy should be terminated. (*Id.*)

In September 2007, after a one month investigation by Novo Nordisk's department of Human Resources was completed, Garriga and Duffy were terminated from Novo Nordisk.

## II.
## Standard of Review

Summary judgment is appropriate when the facts properly supported by the record and taken in the light most favorable to the non-moving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). A material fact is one that "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S> 574, 587 (1986). The Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

The court must consider the evidence contained in the record in the light most favorable to the non-movant. *Casey Enter. V. Am. Hardware Mut. Ins. Co.*, 655 F.2d 598, 602 (5th Cir. 1981). "The opposing party must counter the moving party's affidavits with opposing affidavits or other competent evidence setting forth specific facts to show that there is a genuine issue of material fact for trial." *United States v. An Article of Drug*, 725 F.2d 976, 984-85 (5th Cir. 1984). The opposing evidence must be based on admissible evidence of facts and may not be based upon conclusory allegations. *Bloodsworth v. Smith & Nephew, Inc.*, 476 F. Supp. 2d 1348, 1350 (M.D. Ala. 2006) (quoting *Douglass v. United Serv. Auto Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996)). Once the movant meets the initial burden of demonstrating the absence of a genuine issue of material fact, summary judgment is appropriate if the non-movant fails to make a showing to establish the existence of an element essential to its case, which it has the burden of proof at trial. *Celotex*, 477 U.S. at 322. The Court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

## III.
## Discussion

### A. Sexual Harassment

Both Title VII and the FRCA prohibit employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e-2(a)(1); Fla. Stat. § 760.10(1)(a). Because the FCRA is patterned after Title VII, courts generally apply Title VII case law to discrimination claims brought under the FCRA. *See Lockett v. Choice Hotels Int'l*, 2009 WL 468298 (11th Cir. 2009). Accordingly, there is no need to independently analyze Garriga's FRCA claims.

To establish a sexual harassment claim under Title VII of the Civil Rights Act of 1964 based on harassment by an employer, an employee must show: (1) she belongs to a protected group; (2)

she was subjected to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, or other conduct of a sexual nature; (3) the harassment was based on her sex; (4) the harassment was so severe and pervasive to alter the terms and conditions of employment; and (5) there is a basis for employer liability. *Mendoza v. Borden, Inc.*, 195 F.3d 1238 (11th Cir. 1999) (en banc).

As in most sexual harassment cases, the plaintiff and defendant agree the fourth element is the operative issue. There are four factors that we consider in determining whether actions of Taylor are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246.

**1. Whether the harassment was based upon gender**

Much of Taylor's alleged behavior is not sexually related or gender based so as to constitute sexual harassment. Taylor's first meeting with Garriga involved him asking a question to an entire group, men and women, about which celebrity they would like to sleep with. Because the question was directed to a group of people including both men and women, and because the content was not more offensive to one gender than another, then it is not harassment based upon gender. *See Colon v. Envtl. Techs., Inc.*, 184 F. Supp. 2d 1210 (M.D. Fla. 2001) (establishing guidelines for determining what behavior is sufficiently gender-based to constitute sexual harassment).

Likewise, Taylor merely asking personal questions about Garriga is not based on gender or sexually related. Garriga does not allege that he asked questions as a prelude to making a sexual advance, and does not allege that the questions asked were sexually related. Failing such

allegations, this behavior cannot be considered as sexual harassment.

Taylor locked Garriga out of the meeting on July 17, 2007 and kept her waiting on July 18, 2007, but this is not behavior sexually related or gender biased. Though two women were locked out of the July 17 meeting, no allegation is made that the motivation was due to gender.

The intimidating behavior Garriga alleges also is not sexually related or gender based. Taylor telling Garriga "the last thing you guys want is my 13-inch foot down your back," that she did not meet his expectations as a senior pharmaceutical representative, he would recommend that she find another job, she had not sold anything, she couldn't sell, and her performance "sucked" all spawned from her job performance and not from any sexual or gender-based motivation. Taylor's comments on August 2nd that she "sucked," her name was going to be all over the Wall Street Journal, he was going to report her, she was not going to work the pharmaceutical industry again, and that he would put his "13-inch foot up her ass" relates to his belief that she had violated company policy and the law, and not that he was making a sexual advance or targeting her based on gender. Garriga did not allege in her deposition that Taylor's repeated statement that he would put his 13 inch foot down her back was a sexual comment. (Ex. Garriga Depo to Doc. 25 at 112).

**2. Whether the harassment was severe and pervasive**

The remaining conduct alleged of Taylor does not rise to the level of severity or pervasiveness required by this Circuit to constitute sexual harassment. The sexually related or gender based conduct of Taylor consists of: (1) one instance of touching Garriga on the shoulder; (2) several instances of calling Garriga "candy store" and "candy shop" which Garriga believed to have sexual connotations; (3) leering at Garriga on five particular days; and (4) staring at Garriga's backside on three particular days.

First, this set of allegations does not meet the standard of pervasiveness exhibited in the case law of the Eleventh Circuit. The cases Plaintiff cites to demonstrate pervasiveness feature employees who were harassed at least once a day, every day. *Lockett v. Choice Hotels Int'l, Inc.*, 2009 WL 468298 (11th Cir. Feb 26, 2009) (employee experienced harassment on a daily basis for four months), *Reeves v. C.H. Robinson Worldwide*, 525 F.3d 1139 (11th Cir. 2008) (employee was in an office with daily use of sexually offensive language for a period of nearly three years), *Miller v. Kenworth of Dothan*, 277 F.3d 1269 (11th Cir. 2002) (employee was the target of multiple, strong racial epithets each day for a month), *Billings v. Town of Grafton*, 515 F.3d 39 (1st Cir. 2008) (employee was leered at on a daily basis for over two years). Garriga alleges nothing close to daily harassment during the three month period she worked with Taylor.

Second, the behavior is not severe enough to compensate its lack of pervasiveness. The Eleventh Circuit has generally found behavior to be severe when sexual advances are coupled with humiliating or threatening behavior. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F. 3d 501 (11th Circ. 2000) (employer would give unsolicited massages, had pulled his pants tight to reveal an imprint of his genitals to employee, would rub his body parts inappropriately against the employee, and questioned her about her sex life), *Hulsey v. Pride Rests., LLC.*, 367 F.3d 1238 (11th Cir. 2004) (employer repeatedly asked employee to break up with her boyfriend and date him, and made multiple sexual advances to employee including attempting to pull down her pants multiple times and propositions for sex). Behavior was not found to be severe when non-offensive words or light touching was the only action taken by the defendant. *Gupta v. Florida Bd. Of Regents*, 212 F.3d 571 (11th Cir. 2000) (sexual advances devoid of offensive language coupled with light touching did not constitute severe behavior or sexual harassment).

Taylor's actions, at worst, involve a sexual nickname and one instance of light touching. These are simply not humiliating or threatening enough to be seen as severe in the Eleventh Circuit. Leering at Garriga, though potentially actionable, is not a severe action. No threats were made in any sexual context, nor were they made resultant to any spurned sexual advances. Any humiliation Garriga experienced does not appear to be objectively reasonable as a matter of law.

Lastly, Taylor's behavior was obviously not enough to unreasonably interfere with Garriga's job performance. Garriga mentions in her claim concerning retaliation that she was outperforming other employees Taylor supervised. Clearly there was not an unreasonable interference in Garriga's ability to perform her job if she was outperforming so many other employees, as she alleges.

**B. Retaliation**

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment action. *Hurlbert v. St. Mary's HealthCare Sys., Inc*., 439 F. 3d 126, 1297 (11th Cir. 2006). If Garriga establishes a prima facie case of retaliation, Novo Nordisk then has the burden of articulating a legitimate, non-retaliatory reason for placing her on a Coaching Report and for terminating her. *Id.* If that burden is met, Garriga bears the ultimate burden of proving by a preponderance of the evidence that Novo Nordisk's reasons are a pretext for retaliatory conduct. *Id*. The parties rightfully do not dispute that Garriga's behavior is protected. The other two elements are the pertinent factors.

An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects

his or her status as an employee. *Gupta v. Florida Bd. of Regents*, 212 F.3d 571 (11th Cir. 2000).

**1. Coaching worksheet**

The Coaching Worksheet does not give rise to a claim of retaliation. First, the worksheet itself is not an adverse employment action. Second, the worksheet is not causally connected to the protected activity.

**(a) Adverse Action**

The Coaching Worksheet is not an adverse action as a matter of law. Plaintiff's cited case law demonstrates this sufficiently, as Garriga's case is clearly distinguishable from the facts of the cases when adverse actions were found. In *Crawford v. Carroll*, plaintiff was temporarily denied a pay increase and raise. 529 F.3d 961 (11th Cir. 2008). In *Beard v. 84 Lumber Co.*, plaintiff had valuable accounts taken from him. 206 Fed. Appx. 852 (11th Cir. 2006). In *Sharp v. City of Palatka*, plaintiff was denied previously scheduled training opportunities that allegedly could have lead to a promotion. 529 F. Supp. 2d 1371 (11th Cir. 2008). In *Gupta v. Florida Bd. of Regents*, the plaintiff was denied the ability to extend her window for getting a promotion. 212 F.3d 571 (11th Cir. 2000). The emerging pattern is denying the opportunity for a promotion or pay increase is an adverse action.

As alleged, the only direct consequence is that Garriga would be monitored to assure that her numbers improved. Nowhere in the allegations is she claiming that, because of the Coaching Worksheet, she was denied the opportunity for a promotion or pay increase. What Garriga instead alleges is that if she failed to perform, she would then be placed on a disciplinary measure that could affect her pay or possibility of promotion. As to the fact that Taylor would determine whether she had improved, Garriga is not alleging that Taylor had subsequently found Garriga's behavior

unsatisfactory based on his bias and retaliatory motives. Instead, Garriga only alleges the possibility that an adverse action could happen in the future, and that is not enough in this circuit. If Garriga improved in the cited areas, there would have been no change in her ability to get a promotion or pay increase at her normal ability. Therefore, this cannot be an adverse action.

**(b) Causal Connection**

Even if the Coaching Worksheet could be considered an adverse action, Garriga still does not establish a causal connection. The only contents of the Coaching Worksheet that Garriga contests are the sales numbers. First, Taylor used the same method for getting sales numbers for all his employees. The newer sales numbers Garriga wanted to use were not available until the night after Taylor put her on the Coaching Worksheet. Second, the other content of the worksheet concerns method and performance of her job in areas outside of raw sales numbers. Garriga does not dispute that the issues Taylor found with Garriga on his second ride along were the same issues listed on the Coaching Worksheet. The second ride along and the accompanying report both preceded Garriga's complaint to Taylor about him staring at her. If the content of the Coaching Worksheet reflects Taylor's beliefs about Garriga's performance he observed before her complaints, then there cannot be a retaliatory motivation. *Paskorian v. GTE Directors*, 208 F. Supp. 2d. 1293, 1304-1306 (M.D. Fla. 2002) (finding no casual connection between protected activity and adverse action where steps towards adverse action were already underway before complaint). A causal connection cannot be found here, because the content of the Coaching Worksheet clearly came from sources that predated any complaints made by Garriga.

Plaintiff cites *Shannon v. BellSouth Comm.* for the proposition that events close in temporal proximity can be considered related. 292 F.3d 712, 715-17 (11th Cir. 2002). However, that would apply here only if the content of the Coaching Report first appeared after Garriga's complaints.

## 2. Termination

First, Garriga has engaged in protected action by complaining to Taylor directly as well as to her employer. Second, Garriga suffered an adverse employment action by being terminated. The remaining question is whether there was a causal relation between the adverse action and the protected action.

As a matter of law, there was no such relation. A causal relation can exist without particular evidence if the events occur close in proximity to one other. *Shannon v. BellSouth Comm.*, 292 F.3d 712, 715-17 (11th Cir. 2002). Here, all action taken concerning Garriga's termination occurred after both of her complaints.

By alleging a causal connection, the burden shifts to Novo Nordisk to show a legitimate, non-retaliatory purpose for terminating Garriga. Novo Nordisk has ably met its burden. Facts show that Human Resources launched its own investigation, and decided to terminate Garriga for the reason of violating company policy. At the same time, Human Resources also decided to terminate the other employee involved in the incident for precisely the same reason, even though the other employee had not filed any complaints concerning any of her fellow employees.

By meeting its burden, Novo Nordisk passes the burden to Garriga for her to show that the suggested reason for her termination was merely pretextual. Garriga fails to meet this burden as a matter of law. She claims past managers didn't turn in their own representatives, and, therefore, there is some pretextual nature to Taylor's decision to turn her in. However, her allegation doesn't deny that Taylor has the duty to follow company policy, which requires him to report representatives for potential violations. Regardless of Taylor's motivation to report Garriga, she still has not challenged the legitimate reason or motivation of Human Resources in coming to its decision.

Garriga's only allegations against Novo Nordisk point to timing and oddity of circumstances, but she does not accuse Human Resources of acting on a pretextual basis.

## IV.
## Conclusion

**ORDERED** that Defendant's Motion for Summary Judgment is **GRANTED**, and the Clerk of Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff, to close the case, and to terminate and other pending matters.

**DONE** and **ORDERED** in chambers, in Tampa, Florida, this 20th day of July, 2009.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record.